## INGERSOLL et al. v. MISSOURI VAL. LIFE INS. Co. et al.

*(Circuit Court, D. Kansas. February 22, 1889.)*

1. INSURANCE—COMPANY RETIRING FROM BUSINESS—EQUITY—JURISDICTION.
  Where a life insurance company has for 10 years practically done no new business, and the premium receipts do not pay its running expenses, and its corporate existence is only maintained to wind up its business, though the assets, according to insurance tables, are sufficient to pay policies in force as they are likely to mature, equity will entertain a bill by policy-holders to enforce the termination of their contracts, and the payment of the present value of their policies.

2. SAME.
  As the obligation of the company to pay arises only on the death of the insured, and as the company is not technically insolvent so that a receivership could be had, complainants have no adequate remedy at law.

In Equity. Bill by policy-holders of a life insurance company to enforce the termination of their contracts, and payment of the value of their policies.

*H. H. Ingersoll,* for complainants.
*T. A. Hurd,* for defendant.

BREWER, C. This case, in its facts and in the relief sought, is of a novel character. It is before me for final hearing on the pleadings and proofs. The complainants are policy-holders in the insurance company defendant, which was both a mutual and stock company. Their policies were taken out in the years 1872 and 1873, and they are all of the class known as "Registered Tontine Policies, Class A." At that time the company had a capital stock of $500,000, and was doing, for a company of its years, a large and prosperous business. Pamphlets and circulars were issued by it, picturing in glowing colors its prosperity, and the advantages of insuring with it. Some of these came into the hands of the complainants prior to their application for policies. As a matter of fact only $115,000 of the capital stock had been paid in. The financial panic of 1873 impaired the business of the company, and subsequent financial troubles in Kansas continued to interfere with it, so that about the close of 1877 the company withdrew all its agents from the field, and ceased to solicit insurance. Its capital stock was reduced from $500,000 to $100,000, and the effort of the company has since been to wind up its business. The effect of this has been that through lapses, purchases of policies, and settlements with parties, the number of policies—at one time over 6,000—has been so reduced that

on December 31, 1887, there were only 410 in force, and of these only 29 were premium-paying. These 410 policies amount to $316,213.94. The total premiums received in the year 1886 were $3,779.25; for the year 1887, $2,665.07. The total expense of the company in 1886 was $6,442.77. The following table will show how the policies have diminished:

| | | | |
|---|---|---|---|
| Jan. 1, 1873, | $7,562,360 00 | Dec. 31, 1881, | $734,192 00 |
| Dec. 31, 1874, | 6,566,785 00 | Dec. 31, 1882, | 648,551 80 |
| Dec. 31, 1875, | 5,207,771 00 | Dec. 31, 1883, | 501,913 16 |
| Dec. 31, 1876, | 4,397,137 00 | Dec. 31, 1884, | 446,713 21 |
| Dec. 31, 1877, | 2,332,250 00 | Dec. 31, 1885, | 405,761 16 |
| Dec. 31, 1878, | 1,387,309 66 | Dec. 31, 1886, | 370,941 89 |
| Dec. 31, 1879, | 1,030,642 00 | Dec. 31, 1887, | 317,212 86 |
| Dec. 31, 1880, | 823,716 00 | | |

The receipts have diminished in something like the same proportion, so that now the premium receipts do not pay the running expenses of the defendant. Since 1877 it has practically done no new business. It is in no just sense a going concern. While its corporate existence has been maintained, it has been simply maintained for the purpose of winding up its business. It is true that its assets, according to insurance tables, are sufficient to pay the policies in force, as according to the laws of mortality they are likely to mature, so that it cannot be held that the company is actually insolvent. Now upon these facts I remark that, confessedly, the complainants have no remedy at law. The obligation of the company to pay arises only on the death of the insured, and that event has not transpired. And again, as the company is not technically insolvent, it is at least doubtful whether proceedings could be sustained looking to a receivership and the immediate winding up of the affairs of the company; so that the complainants' remedy, if any they have, is, in a case like the present, in a court of equity to enforce the termination of their contracts, and the payment to them of the present value of their policies. It is, I think, one of the settled propositions of law that when an insurance company becomes insolvent, and its assets are taken possession of by the court for distribution among its creditors, that policies not yet matured will be adjusted at their surrender value, and to that amount established as present obligations against the company. Is the right to do this limited to cases of insolvency, or may it be extended to those cases in which the situation of the respective parties renders it inequitable to compel the further continuance of the contractual relation? I think the answer to this must be that when the situation of the parties, even without any wrong on the part of either, becomes so changed that the continued enforcement of the contractual relation works peril to the one party without benefit to the other, a court of equity may interfere, and declare the contract at an end. There is underlying every contract of insurance between the insured and the insurance company a just expectation that the company will continue the insurance business, adding to its assets by new insurance, and from the premiums thus received diminishing the *pro rata* of expense upon each policy-holder. True, nothing of the

kind is expressed in the contract, but that is the expectation upon which all contracts of insurance are entered into; and whenever that expectation fails,—fails for a series of years, and so far fails that the premiums received do not pay the expenses of carrying on a corporate existence,—then it would be gross inequity to compel the insured to continue his payments with the constantly vanishing expectation of receiving anything at the maturity of his policy. For 10 years this insurance company has been moribund. It is not yet quite a corpse, but its steady and sure progress is towards dissolution and death; and there must come a time —and it seems to me it has in this case—when it would be unjust to compel these complainants to remain bound to this dying corporation. It is not necessary to impute misconduct or fraud to the officers of this corporation; indeed, while this is charged in the bill, I think the testimony fails to show anything of the kind. The truth is, that, finding the insurance business unprofitable, in good faith the company has proceeded to wind up its business, seeking, as was of course legitimate, to save to the stockholders their investment; so that I deem it unnecessary to enter into any consideration of the facts presented as to the alleged misappropriation of funds or other misconduct by the officers. I think they have acted honestly, and according to their best judgment; but notwithstanding this I cannot avoid the conviction that the complainants are entitled to a release for the reasons I have above indicated. As my conclusions are in favor of the equities of the complainants, it follows that their failures to pay premiums since the filing of this bill have worked no forfeiture. I might criticise in some respects the action of the company in respect to attempted payments, but as that is a minor matter, not affecting the substantial rights of the parties, I shall waste no time upon it. I think the complainants are entitled to a decree declaring the contracts at an end, and giving to them an allowance against the company for the amount of the surrender value of their policies. If the parties can agree upon this amount, it will be inserted in the decree; if not, I will refer the matter to some actuary, to state the amount of such surrender value.